(No. 47314.—

# BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 68, DU PAGE COUNTY, Appellee, v. SURETY DEVELOPERS, INC., Appellant.

*Opinion filed Nov. 25, 1975.—Rehearing denied March 25, 1976.*

CREBS, J., took no part.

SCHAEFER, J., dissenting.

William S. Kaplan and Robert Marks, of Chicago (Marks, Marks & Kaplan, of counsel), for appellant.

G. Kent Yowell, of Northbrook, for appellee.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

The basic issue presented by this case concerns the authority of a county board to require a real estate developer to contribute land or money for school facilities as a condition to the issuance of special use permits necessary to development of a subdivision. The circuit court of Du Page County held that such authority did not exist, the appellate court reversed (24 Ill. App. 3d 638), and we granted leave to appeal.

Defendant, Surety Developers, Inc., a building and land development corporation, acquired early in 1958 about 465 acres of unimproved farm land in an unincorporated area of Du Page County. At the time of purchase, defendant intended to divide the land into lots of one or more acres, to service the lots with individual septic tanks and wells, and to sell the vacant lots as so improved. Subsequent seepage tests, however, showed the land unsuitable for individual septic tanks.

The R—2 residential zoning of the area permitted defendant to develop an alternate plan involving dividing the land into lots of less than one acre, and building homes on the smaller lots. The zoning regulations, however, required that lots of this size be served by public water and sewage treatment facilities. No public facilities were available which could be economically extended to serve defendant's property. Consequently, in order to develop the land, defendant would have to build community water and sewer systems, permissible only if the County Board of Supervisors granted a special use permit.

Defendant filed applications for special use permits to build a permanent community sewage treatment plant, two temporary sewage treatment plants, two permanent well sites, and a permanent water tower. On July 31, 1958, the county zoning board of appeals held a public hearing to consider the special use applications. A majority of the approximately 150 persons in attendance opposed the request, citing, among other grounds, that the school could not absorb the projected increase in enrollment. During the 1958-59 school year, plaintiff school district had only a five-classroom school located more than a mile from the proposed development, with an enrollment of 97 students.

The zoning board of appeals, by letter to the County Board of Supervisors, recommended denial of the special use applications, indicating:

> "The Board is unanimously of the opinion that the issuance of these Special Use Permits will allow a subdivision development that is entirely out of character with the uses of adjacent and adjoining property and which would tend to diminish their property values, add to the hazards on the public streets and highways and place a considerable burden on the country school which serves the area."

The zoning board of appeals' recommendation was to be first considered by the building and zoning committee, which would then make its recommendation to the full Board of Supervisors. Defendant began to discuss this problem with individual Board members, was granted a hearing before the committee, and attempted without success to negotiate with plaintiff. On August 19, 1958, after meeting with the committee, defendant, by letter to it, proposed the following plan in response to the committee's expressed concern regarding schools:

> "Insofar as our development will create the need for additional class room facilities in the Goodrich School District, it is our intent to be cooperative with those needs. We therefore agree to the following:
> 1. We will furnish houses as temporary school

facilities at a minimum rental to the School Board, if required, until permanent school facilities can be erected.

2. We will furnish the ground, build a permanent school facility and lease same to the Goodrich School District at a nominal rental of $1.00 per year for a period not to exceed five years, the School Board to purchase said facilities prior to the expiration of the rental term at 80% of the total cost of the facilities."

The county board thereafter granted three of the four requested special uses, denying only the requested operation of the temporary sewage treatment plants. Each special use permit contained as a condition the verbatim proposals in defendant's letter to the committee. The board also approved defendant's first subdivision plat, and within 13 months defendant secured approval of two more subdivision plats in the same area.

Defendant intended to build homes selling in the $14,000 to $17,000 range. It sought the approval of the Veterans Administration (V.A.), since, if that agency determined that the subdivision met its requirements for planning, construction and general acceptability, the V.A. would agree to guarantee private financing when homes were sold to veterans. While the V.A. was still considering the matter, several of plaintiff's representatives visited the agency's Chicago office to complain of the burden that defendant's development would place on the school system. On November 14, 1958, the V.A. wrote a letter to defendant suggesting that as a condition of V.A. approval of the subdivision plans, defendant take responsibility to insure the availability of schools. Defendant replied that it shared this concern and was presently meeting with plaintiff to draw up a formal agreement. Defendant also requested that the V.A. grant conditional approval with the understanding that no loans or sales to veterans would be closed until plaintiff and defendant had signed an agreement. On December 12, 1958, the V.A. issued the conditional approval.

On March 24, 1959, plaintiff and defendant signed an agreement that was, in substance, the same as the conditions of the special use permits, and defendant's original proposal. Plaintiff notified the V.A. of the agreement and the condition was deleted from the V.A.'s approval.

Defendant subsequently began to experience difficulties performing under the agreement. After a series of correspondence and conversations, plaintiff and defendant entered into a new agreement on February 15, 1960. Defendant agreed to donate to plaintiff an improved parcel of land for use as school grounds (stipulated value $35,000), to pay plaintiff $50,000 as an initial contribution toward the construction of the permanent school, and to pay an additional $200 for each home thereafter constructed and occupied in the subdivision. Plaintiff agreed to erect a school building on the site, to request the voters to approve a bond issue, and to cancel the March 24 agreement when defendant made the initial deposit.

All parts of the February 15 agreement were performed except the requirement that defendant pay $200 per home toward the cost of the new school facilities. In 1969, plaintiff brought an action in the circuit court of Du Page County to collect those amounts. At the time of trial, payments for 1030 homes were in issue. Defendant asserted there and maintains here that both contracts were unenforceable because compelled by the attachment to the special use permits of illegal conditions, and counterclaimed for the value of the land ($35,000), and the $50,000 contribution. The trial court agreed and entered judgments for defendant on the complaint and awarded defendant $85,000 on the counterclaim both of which, as earlier noted, were reversed by the appellate court.

The essence of defendant's position is that the conditions imposed on the special use permits were not voluntarily initiated or agreed to by defendant, were not authorized by statute, and bore no relationship to the

special use requested by defendant. It urges that *Rosen v. Village of Downers Grove* (1960), 19 Ill.2d 448, and *Duggan v. County of Cook* (1975), 60 Ill.2d 107, sustain its position. Additionally, it urges that the conditions imposed deprived it of its property without compensation contrary to the holdings of *Pioneer Trust and Savings Bank v. Village of Mount Prospect* (1961), 22 Ill.2d 375, and *People ex rel. Exchange National Bank of Chicago v. City of Lake Forest* (1968), 40 Ill.2d 281.

The authority of a county board of supervisors to attach conditions to a special use permit derives from section 1 of "An Act in relation to county zoning" (Ill. Rev. Stat. 1973, ch. 34, par. 3151; formerly par. 152i), as interpreted in *Kotrich v. County of Du Page* (1960), 19 Ill.2d 181. *Kotrich* involved the validity of the same special use ordinance now before us. It was there held that the special use technique is authorized by statute, and the court said, in relation to the ordinance, "It also empowers the board of supervisors to impose 'such *** conditions as it considers necessary to protect the public health, safety and welfare.' A fair reading of the ordinance shows that it contemplates that the county board will weigh the desirability of the proposed use against its potential adverse impact." 19 Ill.2d 181, 187.

Six weeks later the court announced its opinion in *Rosen*. The issue there was the validity of a village ordinance enacted under the Revised Cities and Villages Act, which authorized the creation of a plan commission, the adoption of an official plan, and the commission's examination of proposed subdivision plats to insure their conformity with the requirements of the official plan. (Ill. Rev. Stat. 1957, ch. 24, pars. 53—2, 53—3; now Ill. Rev. Stat. 1973, ch. 24, pars. 11—12—5, 11—12—12.) The village plan commission had approved two subdivision plats, subject to the condition that the landowners secure a certificate of compliance from local boards of education. In the case of one of the landowners, the board of

education issued its certificate only after the landowner agreed, in effect, to pay the school districts $325 for each lot sold in the subdivision. This court there stated, citing *Petterson v. City of Naperville* (1956), 9 Ill.2d 233, that under the statute a "developer of a subdivision may be required to assume those costs which are specifically and uniquely attributable to his activity and which would otherwise be cast upon the public." (19 Ill.2d 448, 453.) However, since the $325 per lot assessment had been determined by considering factors totally unrelated to the proposed subdivision and since the statute did not authorize the imposition of monetary charges as a condition to plat approval, this court held that the circuit court properly enjoined those practices. (19 Ill.2d 448, 453-54.) Whether a municipality could, under the statute, require the dedication of land for school grounds was not considered. 19 Ill.2d 448, 455.

*Pioneer,* too, was concerned with the validity of a village ordinance. The specific portion there in issue required that a subdivider dedicate land for public use according to a stated formula. The court there restated the *Rosen* test in the following language:

> "If the requirement is within the statutory grant of power to the municipality *and* if the burden cast upon the subdivision is specifically and uniquely attributable to his activity, then the requirement is permissible; if not, it is forbidden and amounts to a confiscation of private property in contravention of the constitutional prohibitions rather than reasonable regulation under the police power." (Emphasis supplied.) 22 Ill.2d 375, 380.

The significance of this statement is that land dedication requirements in Illinois that were not specifically and uniquely attributable to the activity of the subdivider were now constitutionally infirm, as well as unauthorized by statute. The "specifically and uniquely attributable" test

was reaffirmed as a constitutional requirement in *People ex rel. Exchange National Bank of Chicago v. City of Lake Forest* (1968), 40 Ill.2d 281, 286-87, and, while *Rosen* and *Pioneer* concerned village ordinances enacted under the authority of a municipal plat and subdivision statute, which has a county counterpart in section 25.09 of the statute relating to the powers of county boards (Ill. Rev. Stat. 1973, ch. 34, par. 414), and the present case concerns the special use technique authorized by section 1 of the County Zoning Act (Ill. Rev. Stat. 1973, ch. 34, par. 3151), which has a municipal counterpart in section 11—13—1.1 of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, par. 11—13—1.1), defendant is correct in asserting that the elevation of the *Rosen* test to a constitutional basis in *Pioneer* applies to land dedication requirements regardless of the legislation involved.

As earlier indicated, *Rosen* and *Pioneer* both held invalid the contributions required of the developers in those cases. At no time, however, has this court held that land dedication requirements for school grounds are unauthorized by the Municipal Code (Ill. Rev. Stat. 1973, ch. 24, pars. 11—12—5, 11—12—12) or predecessor statutes. Nor has it held that land dedication requirements for school grounds are automatically in violation of the Constitution. Quite the contrary is true, for the implications of both *Rosen* and *Pioneer* are that land dedication requirements proportioned to the needs specifically and uniquely attributable to the developer's activities would be valid.

We note that the American Law Institute in its Model Land Development Code similarly recommends that a county be empowered to authorize the conditioning of a special development permit on the developer's dedication of land for schools, or fees in lieu of dedication, so long as the demands are "reasonably allocable to the development —measured in terms of the need for such facilities created by the development." A Model Land Development Code

(Proposed Official Draft No. 1, 1974), sec. 2–103(3), Note, at 44-47.

To support its contention that the conditions are illegal, defendant has relied heavily on certain language in *Duggan v. County of Cook* (1975), 60 Ill.2d 107. There, a landowner sought a zoning change and a special use permit for the development of a mobile-home park with a sewage treatment plant and community wells. The Cook County Board of Commissioners, rejecting the recommendation of the zoning board of appeals, denied the landowner's request. Our opinion in *Duggan* dealt principally with the validity of the Cook County zoning ordinance and its proper application to the factual circumstances presented in that case. However, the zoning board of appeals had recommended attaching to the grant of the special use permit a condition requiring the developer to contribute money to the school districts. We noted that the validity of that condition was not "briefed or presented" (60 Ill.2d 107, 114) to us. Consequently the comment there made that "there is no power under the guise of zoning authority to require the payment of a sum of money to a school district as a condition to the zoning" (p. 117) cannot be regarded as having precedential value.

Defendant urges that the conditions imposed relating to schools bear no reasonable relationship to a special use permitting community sewer and water facilities. We do not agree that so restricted a view is required. (See *Kotrich* at 187.) Neither we nor the county board members need blind ourselves to the applicant's ultimate objective in seeking the permit or the ultimate result of its issuance. Once issued, defendant was free to develop a small-lot subdivision with an unmistakable impact upon the existing school system, and intended to do so. The extent of that impact is demonstrated by the fact that at the time this case was tried there were approximately 1400 children in the two elementary schools in defendant's subdivision, 98% of whom were from this development.

Plaintiff has suggested that our "specifically and uniquely attributable" test is more narrowly drawn than the Constitution demands, and urges that we reexamine this test in light of more recent holdings in other jurisdictions, namely, *Associated Home Builders, Inc. v. City of Walnut Creek* (1971), 4 Cal. 3d 633, 484 P.2d 606, 94 Cal. Rptr. 630, 43 A.L.R.3d 847, *appeal dismissed* (1971), 404 U.S. 878, 30 L. Ed. 2d 159, 92 S. Ct. 202; and *Jordan v. Village of Menomonee Falls* (1965), 28 Wis. 2d 608, 137 N.W.2d 442, *appeal dismissed* (1966), 385 U.S. 4, 17 L. Ed. 2d 3, 87 S. Ct. 36. We consider such reexamination unnecessary here, however, for in our opinion the conditions imposed in this case were designed to alleviate a school problem specifically and uniquely attributable to defendant's activity. *Pioneer* involved the addition of a 250-lot subdivision to an existing municipality. The court found that the school needs were the result of the total development of the community and not specifically and uniquely attributable to the new addition —yet the village plan commission attempted to require the developer to pay the entire cost of remedying a problem not entirely of his making. The dedication requirement was simply not limited to the portion of the school needs specifically and uniquely attributable to the developer's activity. By contrast, the subdivision before us was not an addition to an existing municipality but the commencement of a new one. This case arose precisely because defendant chose to purchase and develop land in a sparsely settled rural area, so far from public sewer and water facilities that it had to construct community facilities. Defendant dramatically changed the character of the surrounding area. By the time defendant submitted its third subdivision plat for approval in September, 1959, it was appearing before the Board of Trustees for the newly incorporated Village of Woodridge rather than the Du Page County Board of Supervisors. The conditions imposed by the county board on the special use permit required

defendant to dedicate land for a school site and to contribute a modest percentage towards the cost of a school building which defendant would erect and sell to the school board at a reduced figure. As earlier noted, at the time of trial in 1972, nearly 98% of the students attending the schools subsequently built in defendant's development lived inside the development. While this factor is not by itself determinative, we find ample evidence that the need for more schools was almost entirely attributable to defendant's activity; the conditions imposed clearly were reasonable in light of defendant's contribution to the creation of the school problem.

We hold, therefore, that the conditions were authorized by statute, were a reasonable regulation under the police power, and in conformity with the tests enunciated in *Rosen* and *Pioneer*.

Defendant's argument that its contracts with the school board are tainted with the illegality of the permit conditions loses force in view of our holding that the conditions are valid. One point, however, merits discussion. In *Rosen*, a plan commission's practice of requiring, as a condition to the approval of a subdivision plat, that the developer secure a certificate of compliance from local boards of education was held invalid. That practice was said to be an abdication of authority. (19 Ill.2d 448, 454.) Defendant urges that the facts reveal the same situation here. We do not agree, for there is, in our judgment, a substantial difference between *Rosen* and what occurred here. When, in cases of this type, a special use permit is sought for a purpose which, on balance, may be desirable but the accomplishment of which will, in the absence of special conditions, have certain adverse effects, a determination must be made as to the terms of the permit reasonably necessary to eliminate or minimize to a tolerable point the anticipated problems. That determination, under the statute, is to be made by the agency or board charged with responsibility for issuing the permit. In

*Rosen,* the commission abdicated that responsibility by, in effect, telling the developer he must agree to do whatever the local school boards considered necessary or desirable and that, until those bodies said he had done so, no approval would be given by the commission. Here, to the contrary, the determination as to the conditions imposed was made by the county board, not the school district. Of course the board members heard the views of persons interested in and informed about the school district—and the developer's views—as conscientious and prudent board members would be expected to do, but the ultimate determination was made by the board, not the district. The fact that the conditions imposed substantially or even totally coincided with terms agreed upon by the parties before the board does not *per se* impeach the validity of those conditions. And the fact that those conditions were stated in the words of the developer's offer precludes, it seems to us, any complaint by it that their vagueness necessitated the contract upon which the plaintiff is here relying.

What we have said, we think, substantially disposes of defendant's arguments that the contracts were the result of duress since those arguments were predicated on the alleged illegality of the conditions imposed upon the special use permits. Complaint is also made of the school district's intervention in defendant's negotiations with the Veterans Administration seeking financing guarantees for veterans who purchased defendant's homes. The Veterans Administration, however, also had a responsibility: to ascertain that defendant's subdivision and available facilities, including schools, were adequate and merited approval. We see nothing sinister in the fact that in doing so it listened to the view of, or consulted with, school district representatives.

The present action is, of course, founded on the second contract, which substantially differs from the original. This second contract, however, was negotiated at

defendant's urging and presumably to its advantage; it was not required by the county board. Since we have held the first contract valid, the second is obviously so.

The judgment of the appellate court is affirmed and the cause remanded to the circuit court of Du Page County for further proceedings consistent with this opinion.

*Affirmed and remanded.*

MR. JUSTICE CREBS took no part in the consideration or decision of this case.

MR. JUSTICE SCHAEFER, dissenting:

By this decision the court has conferred upon county boards the power to impose requirements of cash payments as conditions for the granting of permits for special uses. No such authority has ever been granted by any statute, either to counties or municipalities, and all of the previous decisions of this court have denied that such an authority exists. In the last of those decisions, *Duggan v. County of Cook* (1975), 60 Ill.2d 107, 117, the court said:

"*** We also concur that there is no power under the guise of zoning authority to require the payment of a sum of money to a school district as a condition to the zoning. See *Rosen v. Village of Downers Grove* (1960), 19 Ill.2d 448, 453-454; *Pioneer Trust and Savings Bank v. Village of Mt. Prospect* (1961), 22 Ill.2d 375."

In the *Rosen* case the court affirmed a decree which held invalid an agreement that had required the developer to pay $325 per lot sold as a condition for approval of a plat of subdivision containing 52 lots. There we pointed out:

"The record in this case shows that the boards of education arrived at the sum of $325 per lot by taking into account factors totally unrelated to the proposed subdivision, such as the time lag between the date when homes are

occupied and the date when taxes upon the completed homes are collected. Neither the statute nor the ordinance authorized the plan commission to abdicate its authority in favor of the boards of education. And regardless of advantages of flexibility in equalizing financial burdens that might be secured by substituting monetary charges for the dedication of land, or by combining monetary charges with the dedication of land, the plain fact is that the statute does not authorize this technique. In our opinion the circuit court properly enjoined these practices." (19 Ill.2d at 453-54.)

And in the *Rosen* case we held that the payments of $325 per lot had been exacted from the subdivider by duress, saying:

"The record shows that Firestone is engaged in the business of subdividing raw land upon a large scale, and that it is under contractual obligations to furnish building sites to contractors who are engaged in the construction of buildings. The economic pressure upon such a large scale developer is obvious and we think duress has been established in this case." 19 Ill.2d at 455-56.

The similarity between the case now before us and the *Rosen* case is obvious.

When the *Rosen* case was decided in 1960, and when *Pioneer Trust and Savings Bank v. Village of Mount Prospect,* 22 Ill.2d 375, was decided in 1961, the statute which required plan commission approval of a plat of subdivision authorized the imposition of "reasonable requirements for public streets, alleys, ways for public service facilities, parks, playgrounds, school grounds, and other public grounds." (Ill. Rev. Stat. 1959, ch. 24, pars. 53–2, 53–3; 19 Ill.2d at 451.) Shortly after *Pioneer* was decided, the statute was altered to provide:

"Whenever the reasonable requirements provided by the ordinance including the official map shall indicate the necessity for providing for a school site, park site, or other public lands within any proposed subdivision for which approval has been requested, and no such provision has been made therefor, the municipal authority may require that lands be designated for such public purpose before approving such plat. Whenever a final plat of subdivision, or part thereof, has been approved by the corporate authorities as complying with the official map and there is designated therein a school site, park site or other public land, the corporate authorities having jurisdiction of such use, be it a school board, park board or other authority, such authority shall acquire the land so designated by purchase or commence proceedings to acquire such land by condemnation within one year from the date of approval of such plat; and if it does not do so within such period of one year, the land so designated may then be used by the owners thereof in any other manner consistent with the ordinance including the official map and the zoning ordinance of the municipality." Laws of 1961, at 2762; Ill. Rev. Stat. 1961, ch. 24, par. 11—12—8.

The General Assembly has never authorized the sale of special use permits, nor has it ever authorized county or municipal governing bodies to exact cash contributions from real estate developers as the price of approval of plats of subdivision. If such legislation should ever be adopted, it would give rise to serious constitutional questions which need not now be addressed. It is enough at this time and on this record to note that the county board exercised in this case an authority that was never conferred upon it by the General Assembly.